**NOT FOR PUBLICATION**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

_____
                                           :
MATTHEW PLASENCIA, et al.,                 :
                                           :
                    Plaintiff,             :    **Civil No. 09-5727 (FLW)**
                                           :
        v.                                 :    **OPINION**
                                           :
ORGILL, INC., et al.,                      :
                                           :
                    Defendants.            :
_____:

WOLFSON, United States District Judge:

This diversity action stems from an aerosol spray paint can ("spray paint can" or "aerosol can") injury that caused debilitating injuries to Plaintiff Matthew Plasencia's ("Mr. Plasencia's") eye and rendered him permanently disabled.  Presently before the Court are two motions for summary judgment: one by Defendant Ball Aerosol and Specialty Container, Inc. ("Ball"), the designer and manufacturer of the spray paint can, and another by Defendants Rust-Oleum Corp. ("Rust-Oleum"), the company that filled the can with paint once it was manufactured, as well as Orgill, Inc. and RPM International Inc.. Plaintiff Matthew Plasencia along with his co-plaintiff and wife, Heather Plasencia ("Mrs. Plasencia") (collectively, "Plaintiffs"), concede that Orgill, Inc. ("Orgill") and RPM International Inc. ("RPM"), should be dismissed from this action, which leaves Ball and

Rust-Oleum as the only two remaining defendants.[1]

The Court held oral argument on both summary judgment motions on March 8, 2012. Most aspects of the parties' motions were decided on the record. The Court issues the instant Opinion solely on the issue of punitive damages. For the reasons explained herein, summary judgment is granted on Plaintiffs' request for punitive damages against both Ball and Rust-Oleum.

I.   BACKGROUND

   A.   Facts

The following facts are undisputed by the parties unless otherwise indicated. Prior and up until the spray paint can incident, Mr. Plasencia worked as a quality control inspector for Mid-State Filigree Systems ("Mid-State") a concrete slab manufacturer located in Cranbury, New Jersey. Mr. Plasencia's job responsibilities included performing quality control on cured, prefabricated slabs of concrete before those slabs were shipped from the Cranbury plant. At the beginning of his work day, Mr. Plasencia would take a can of blue spray paint and mark any deformities he found on a given concrete slab. The day before Mr. Plasencia performed his quality control review, concrete was poured and set in beds in the late morning and afternoon. Then, the slabs would cure overnight while set on top of a series of large gas-fired butane heaters measuring approximately 480 feet in length.

---

[1] Based on this concession, Defendants Orgill, Inc. and RPM International Inc. are hereby dismissed from this action.

On February 17, 2009, at 6:20 a.m., Mr. Plasencia opened a new can of blue spray paint to use when marking slabs.  According to Mr. Plasencia, the label on the can advised that the can should be shaken for approximately 30 seconds, and further directed users: "do not heat, do not puncture, do not put near flammables ...."  Plasencia Dep. 77:8-11.  While he was preparing to use the spray paint can, Mr. Plasencia was standing nearby the slab curing bed.  It is not clear from the testimony where exactly Mr. Plasencia was standing and how far away he was from the curing bed and butane heater at that time.

Mr. Plasencia shook the can before attempting to utilize it, but did not hear the agitator ball rattle.  He shook the can again in order to loosen the agitator ball and it exploded in his face.  Mr. Plasencia sustained severe injuries to his face and eye as a result.

Following the accident, the aerosol can was preserved.  It was discovered that Ball manufactured the body of the can and the bottom of the can, including its seam.  Ball then sold the can to Rust-Oleum for filling and capping.  Rust-Oleum filled the can with the blue spray paint, added a "dip tube" which brings paint from the bottom of the can to the spray nozzle, and the nozzle.  Plaintiffs, Ball, and Rust-Oleum secured experts who analyzed the can and have espoused competing theories as to why the can exploded.  Additional facts relating to the parties' expert reports, the manufacturing and testing processes, and the incident itself are discussed in more detail, where appropriate, below.

B.   **Procedural History**

Plaintiffs initially filed their Verified Complaint ("Complaint") in the Philadelphia County Court of Common Pleas on May 1, 2009. In their Complaint, Plaintiffs alleges that Mr. Plasencia was injured at work when a spray paint can entitled Premium Indoor/Outdoor Multi-Purpose Enamel DOT 2P 5702; Serial No. 2006612172, Model No. MP1008 Gloss Royal Blue 1439728 exploded in his face on February 17, 2009. Compl., ¶¶ 7-14. A few weeks after the complaint was filed, on May 19, 2009, Defendant Orgill, Inc. removed the suit to the United States District Court for the Eastern District of Pennsylvania on the basis of diversity jurisdiction. Thereafter, on June 12, 2009, Plaintiffs filed a Verified Amended Complaint ("Amended Complaint").

The Amended Complaint asserts four counts under New Jersey law: Count I is a negligence claim against Orgill, Rust-Oleum, RPM, and Ball Corp.; Count II is a product liability claim governed by the New Jersey Product Liability Act, N.J.S.A. 2A:58C–1 et seq. ("NJPLA") against all defendants; Count III is a breach of warranty claim against all defendants; and, lastly, Count IV is a loss of consortium claim by Mrs. Plasencia against all defendants. To be clear, and as noted, Plaintiffs concede that Defendants Orgill and RPM should be dismissed. Plaintiffs also concede, as they should, that the negligence claim and the breach of warranty claim are subsumed by their product liability claim. See Sinclair v. Merck & Co., 195 N.J. 51, 65 (2008) (holding that "when the underlying claim is one for harm caused by a product" that claim is subsumed by the NJPLA). Hence the remaining

4

two counts in the Amended Complaint are against Ball and Rust-Oleum for product liability (Count II) and loss of consortium (Count IV). Through their product liability claim, Plaintiffs asserts that the spray paint can is both defectively designed and manufactured, and that the label fails to warn of all hazards.

On July 28, 2009, after the Amended Complaint was filed, several of the defendants moved to transfer the suit to the District of New Jersey. That motion was granted on October 9, 2009. The parties engaged in discovery and, on January 28, 2011, Ball moved for summary judgment on Plaintiffs' Amended Complaint. That same date, Orgill, RPM, and Rust-Oleum also moved for summary judgment. During the parties' extensive briefing period, a dispute arose as to the propriety of Plaintiffs' sur-reply brief to Ball's motion. Plaintiff attached to that brief a Supplemental Expert Report by their expert, Dr. David Pope. Ball objected to the attachment of the supplemental report and requested that the sur-reply be stricken. Judge Lois H. Goodman, the Magistrate Judge assigned to this matter, addressed this issue with the parties, and Defendants agreed to withdraw their summary judgment motions in order to engage in additional discovery on the supplemental expert report. The defendants withdrew their motions on June 13, 2011, without prejudice, and with the right to re-file no later than August 26, 2011.

On that date, August 26, 2011, Ball and Rust-Oleum re-filed their respective motions. The parties, again, engaged in extensive briefing, including the filing of a sur-reply brief

5

and numerous exhibits.

## II.     STANDARD OF REVIEW

Summary judgment is appropriate where the Court has determined that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317 330 (1986). A "material fact" is one that could affect the outcome of a suit under the applicable rule of law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Disagreements over irrelevant or unnecessary facts will not preclude a grant of summary judgment. Id. "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupportable claims or defenses, and . . . that [the rule] should be interpreted in a way that allows it to accomplish this purpose." Celotex, 477 U.S. at 323-24. "[W]hen the record is such that it would not support a rational finding that an essential element of the non-moving party's claim or defense exists, summary judgment must be entered for the moving party." Turner v. Schering-Plough Corp., 901 F.2d 335, 341 (3d Cir. 1990).

The party moving for summary judgment has the burden of establishing that no "genuine issue" exists. Celotex, 477 U.S. at 330. Once the moving party satisfies this initial burden, the non-moving party "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). To do so, the non-moving party must "go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" Celotex, 477 U.S. at 324. In other words, the non-moving party must "do more than simply

6

show that there is some metaphysical doubt as to material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986); see also Ridgewood Bd. of Ed. v. Stokley, 172 F.3d 238, 252 (3d Cir. 1999).

At the summary judgment stage the court's function is not to weigh the evidence and determine the truth of the matter, but rather to determine whether there is a genuine issue for trial. Anderson, 477 U.S. at 249. A genuine issue of material fact is one that will permit a reasonable jury to return a verdict for the non-moving party. Id. at 248. In evaluating the evidence, a court must "view the inferences to be drawn from the underlying facts in the light most favorable to the [non-moving] party." Curley v. Klem, 298 F.3d 271, 276-77 (3d Cir. 2002) (citations omitted).

### III.  DISCUSSION

Under New Jersey's Punitive Damage Act ("the Act"), punitive damages may be awarded "only if the plaintiff proves, by clear and convincing evidence, that . . . the defendant's acts or omissions . . . were actuated by actual malice or accompanied by a wanton and willful disregard of persons who foreseeably might be harmed by those acts or omissions." N.J.S.A. 2A:15-5.12. "Actual malice means an intentional wrongdoing in the sense of an evil-minded act." N.J.S.A. 2A:15-5.10 (internal quotation mark omitted). "Wanton and willful disregard is defined as a deliberate act or omission with knowledge of a high degree of probability of harm to another and reckless indifference to the consequences of such act or omission." Id.

Negligent, even grossly negligent, conduct cannot form the basis of a punitive damages claim. Smith v. Whitaker, 160 N.J. 221, 242 (1999). "There must be circumstances of aggravation or outrage, which may consist of such a conscious and deliberate disregard of the interests of others that the [defendant's] conduct may be called wanton and willful." Dong v. Alape, 361 N.J.Super. 106, 116 (App. Div. 2003). This "standard can be established if the defendant knew or had reason to know of circumstances which would bring home to the ordinary reasonable person the highly dangerous character of his or her conduct." Id. at 116-17 (citing McLaughlin v. Rova Farms, Inc., 56 N.J. 288, 306, 266 A.2d 284 (1970)).

The Punitive Damages Act further instructs that:

> In determining whether punitive damages are to be awarded, the trier of fact shall consider all relevant evidence, including but not limited to, the following:
>
> (1) The likelihood, at the relevant time, that serious harm would arise from the defendant's conduct;
>
> (2) The defendant's awareness of reckless disregard of the likelihood that the serious harm at issue would arise from the defendant's conduct;
>
> (3) The conduct of the defendant upon learning that its initial conduct would likely cause harm; and
>
> (4) The duration of the conduct or any concealment of it by the defendant.

N.J.S.A. 2A:15-5.12b. These factors are non-exclusive. See Pavlova v. Mint Management Corp., 375 N.J.Super. 397, 404 (App. Div. 2005).

8

Overall, courts have described the punitive damages standard as a strict one; punitive damages are limited to only "exceptional cases." Id. See also Dong, 361 N.J.Super. at 116 ( noting that defendant's conduct must be "particularly egregious"). Moreover, because punitive damage awards are not designed to compensate plaintiffs, an award does not depend upon the extent of injury suffered. See Smith, 160 N.J. at 225.

Here, Plaintiffs have not alleged that either defendant acted with actual malice. Rather, they assert that both Defendant Ball and Rust-Oleum wantonly and willfully disregarded the interests of users of their spray paint cans by placing defective cans into commerce. Plaintiffs hinge their argument on an internal Rust-Oleum expert report ("the Grunes Report") that addressed spontaneously exploding cans. That report was prepared at the request of Rust-Oleum, who hired an independent expert to analyze incidents involving aerosol cans purchased from Ball's predecessor, U.S. Can, and other manufacturers. In rendering the report, the expert was given data on six aerosol can explosions, three of which were manufactured by U.S. Can. Pl. Opp.., Exh. R ("Grunes Report") at 3. For those explosions, the expert was also provided with the remnants of the cans, which I will refer to hereafter as the "sample cans." Written descriptions of three additional explosions were provided to the expert but, for these, no specimens were provided. Id. at 4.

As an initial matter, the Court notes that the report explicitly concludes that its

findings are "qualified, requiring additional information" because the sample size of the study was small, some cans were from different manufacturers (other than U.S. Can), and the independent expert had been provided with limited specifications, drawings, and quality control procedures relating to the sample cans. Pl. Opp.., Exh. R. With that qualification, the report concludes that the sample cans "all failed by explosive decompression beginning with the neck just above the base seal and propogating about the circumference of the can wall ...." Id. at 2. According to the report,

> [t]he determination as to the cause, made difficult by the infrequency of occurrence, is considered to have stemmed from the can neck design, to include the geometry, the material, as-fabricated, and/or possible can manufacturing defects, including deviations in quality assurance/control.

Id.

Moreover, the report continues,

> [t]he design/manufacture of the lower neck created a condition where the stresses attributed to consumer efforts to release the sediment bound agitator (marble) by shaking the can or hitting the bottom were sufficient to flex and crack the notch of the neck allowing the internal pressure to rupture the can wall and spread the rupture around the can circumference.

Id. Further, the report indicates that the necks of the sample could not be examined because they were purchased by Rust-Oleum from various manufacturers with adhesive labels covering the necks. Id.

The Grunes Report suggests that the can manufacturers, including Ball's

10

predecessor, U.S. Can, "should review the design/manufacture and quality assurance/quality control of the necked-in cans to better understand the stresses on the as-manufactured cans and the neck walls." Id.  Importantly, the report also distinguishes between cans containing primer and metallic finishes, which are "heavier/denser" than other varieties of paint.  Id. at 5.  The report suggests that can manufacturers evaluate whether "those [paints] having heavy/dense sediments (e.g., red primer, galvanizing - 93% zinc - and 'gold rush')" place greater stress on a can than less dense paints.[2]  While recommending a review of the design and manufacture of the necked-in wall feature, the report acknowledges that explosions are nonetheless rare.  Id. at 11.

As for Rust-Oleum, the report suggests that Rust-Oleum "audit its handling of ordered cans to better understand the represented features and caveats by the manufacturer to establish if any handling or production activities could have affected the received cans in any way, whether or not associated with the subject problem."  Id. at 3.  Moreover, the report notes, Rust-Oleum's quality control testing would likely not reveal any defects in the cans necks due to the pre-affixed labels.  In addition, a Department of Transportation "hot water bath" quality control test procedure followed by Rust-Oleum would not likely reveal any defect in the cans' necks.  Id. at 11.

---

[2]  The report suggests that primer and metallic particle coatings tend to form a "heavy" deposit on the bottom of the can and that, consequently, such paints are more difficult to mix with the marble agitator than other paints.  Id. at 9.

11

In my view, the Grunes Report does not provide sufficient facts from which a jury could conclude that either Ball or Rust-Oleum knew that their spray paint cans were defectively designed or manufactured, or that either defendant acted willfully and wantonly in continuing to sell the cans.  As noted, the defendant's awareness that its reckless disregard of the likelihood that the serious harm at issue would arise from the its conduct is one of the factors courts are to consider in deciding the propriety of a punitive damages request.  See  N.J.S.A. 2A:15-5.12b(2).  The Grunes Report expressly qualifies its conclusion that the cans were defectively designed or manufactured as based on an insufficient sample size, and the report repeatedly refers to the rarity of explosions.  In addition, the report focuses on primer and metallic paints products as being especially susceptible to any defects in the cans; Plaintiffs have not argued that the spray paint in the can shook by Mr. Plasencia was of this sort.

Furthermore, to the extent the report makes a conclusion, it suggests that there may be a defect in the can neck design.  Here, in contrast, and as Plaintiff's counsel stated at oral argument, Plaintiffs' expert opines that the bottom of the can is defective—not the neck.  In short, it is clear from my reading of the Grunes Report that it could not have placed Ball or Rust-Oleum on notice that the type of explosion that occurred here was likely to take place.

My reasoning is in line with that of the New Jersey Appellate Division in Pavlova,

12

supra. At issue in that case was a product liability claim against the manufacturer and installer of a wall heater installed in a tenant's bathroom nearby a towel rack. While the tenant was preparing to bathe, her towel hanging on the towel rack caught fire. She sought punitive damages against her landlord (who had installed the heater), alleging that the landlord failed to warn her of the fire-related dangers inherent in placing a towel on a towel rack nearby a wall heater. As evidence of the landlord's willful and wanton conduct, the tenant pointed to two prior fires in her building (of which the landlord was aware) that involved the same wall heaters. Id. at 408. However, because neither of those fires originated in the same manner as her fire, the court did not find those prior incidents probative of the landlord's knowledge. So too, here, the lack of congruence between the explosions examined in the Grunes Report and Mr. Plasencia's explosion shows that the report does not demonstrate willful or wanton conduct on Ball or Rust-Oleum's part.

The Pavlova Court also addressed the tenant's reliance on a fire official recommendation that the towel racks not be placed so close to the wall heater. The court held that tenant's reliance was misplaced because the recommendation was not in the form of an order or fire code violation. Pavlova, 375 N.J. Super. at 406. Similarly, here, while the Grunes Report makes several suggestions about further examination that could be done by the defendants, Plaintiff has not pointed to any evidence that these suggestions were echoed by a regulatory agency or standard. They are simply the suggestions of an

13

independent expert and, accordingly, insufficient to support a punitive damages claim in this case.  Indeed, "absent here is the blatantly egregious, deliberate conduct that was practically certain to cause both imminent and serious harm."  Pavlova, 375 N.J.Super. at 407.  At most, Plaintiffs may have alleged negligence by the Defendants, but not wanton and willful disregard of the likelihood of resulting serious harm.  Plaintiffs' punitive damages claims against both defendants necessarily fail.

## III.   CONCLUSION

For the foregoing reasons, summary judgment is granted on Plaintiffs' punitive damages against Defendants Ball and Rust-Oleum.  The remaining aspects of the parties' motions were addressed on the record at oral argument and those dispositions will be set forth in an Order accompanying this Opinion.

/s/ Freda L. Wolfson
Freda L. Wolfson, U.S.D.J.

Dated: March 9, 2012